# Exhibit 2

# ALAA Contract 2022 - 2025

Collective Bargaining Agreement Between
The Association of Legal Aid Attorneys, UAW 2325 (AFL-CIO) and
The Legal Aid Society (NYC)

*Supersedes the 2016-2019 contract and incorporates all memoranda of agreement and understanding through December 29, 2023.*

# Contents

Preamble ...................................................................................................................... 5

**Article 1/Labor Relations** .......................................................................................... 6

§ 1.1.   Union Recognition and Agency Shop ........................................................... 6

§ 1.2.   Collective Bargaining Agreement ................................................................. 6

§ 1.3.   No Strike or Lockout ..................................................................................... 7

§ 1.4.   Union Access to Financial Records .............................................................. 7

§ 1.5.   Union Activities ............................................................................................. 7

§ 1.6.   Presence of Union Representatives................................................................ 8

§ 1.7.   Joint Union-Mangement Committees ............................................................ 8

§ 1.8.   Grievances ..................................................................................................... 8

§ 1.9.   Management Rights ........................................................................................ 9

§ 1.10.  Future Joint Lobbying ................................................................................. 10

**Article 2/Compensation**........................................................................................... 11

§ 2.1.   Salary ........................................................................................................... 11

§ 2.2.   TransitCheks ................................................................................................ 12

§ 2.3.   Bar Registration Fee .................................................................................... 13

§ 2.4.   Fellowships .................................................................................................. 13

§ 2.5.   Loan Assistance ........................................................................................... 13

§ 2.6.   Bar Association Dues ................................................................................... 13

§ 2.7.   Compensatory, Personal and Flex Time....................................................... 13

§ 2.8.   Health Insurance .......................................................................................... 15

§ 2.9.   Life Insurance .............................................................................................. 17

§ 2.10.    Pension ......................................................................................................... 17

§ 2.11.    Tax Shelters ................................................................................................. 17

§ 2.12.    Vacation ....................................................................................................... 18

§ 2.13.    Adoption & Fertility Treatments .................................................................. 19

§ 2.14.    Childcare ...................................................................................................... 19

§ 2.15.    Vacation Donation ........................................................................................ 19

§ 2.16.    Vision Benefits ............................................................................................. 19

§ 2.17.    Dental Benefits ............................................................................................ 19

**Article 3/Employment  Policy.................................................................................20**

§ 3.1.    Fair Employment Practices ........................................................................... 20

§ 3.2.    Hiring ............................................................................................................ 22

§ 3.3.    Employment Status ....................................................................................... 23

§ 3.4.    Leave ............................................................................................................. 23

§ 3.5.    Free Speech ................................................................................................... 26

§ 3.6.    Interpersonal Conflict ................................................................................... 26

§ 3.7.    Part-Time Work Schedules ........................................................................... 26

§ 3.8.    Telecommuting .............................................................................................. 28

§ 3.9.    Transfers and Promotions ............................................................................. 28

§ 3.10.    Expenses ....................................................................................................... 28

§ 3.11.    Personnel Records ........................................................................................ 30

§ 3.12.    Pro Bono Representation ............................................................................... 30

§ 3.13.    Senior Staff Retention .................................................................................. 30

§ 3.14.    Job Security .................................................................................................. 30

§ 3.15.    Resignation ........................................................................................... 32

§ 3.16.    Voluntary Retirement Incentive Program ............................................ 32

§ 3.17.    Health and Safety ................................................................................. 33

§ 3.18.    Record Keeping .................................................................................... 34

§ 3.19.    Protections for Immigrant Staff ........................................................... 34

**Article 4/Quality of Representation** .......................................................... **35**

§ 4.1.    Standard of Advocacy ........................................................................... 35

§ 4.2.    Continuity of Representation ................................................................. 35

§ 4.3.    Workload ............................................................................................... 36

§ 4.4.    Interview Conditions ............................................................................. 38

§ 4.5.    Office Day ............................................................................................. 38

§ 4.6.    Attorney-Client-Supervisor Relationship ............................................ 38

§ 4.7.    Training, Education, and Certification .................................................. 39

§ 4.8.    Malpractice Insurance ........................................................................... 42

§ 4.9.    Outside Counsel .................................................................................... 42

§ 4.10.    Special Litigation ................................................................................ 42

§ 4.11.    Support Services .................................................................................. 43

§ 4.12.    Law Enforcement Issues ...................................................................... 43

§ 4.13.    Society Policy Positions ...................................................................... 43

**Signature Page** ............................................................................................. **44**

**Appendix** ....................................................................................................... **45**

# Preamble

This Collective Bargaining Agreement is an expression of the parties' shared commitment to: 1) Delivery of the highest possible quality of indigent legal representation; 2) Mutual respect among, and fair treatment of all Legal Aid Society staff; and 3) Full participation by the Union and its members in pursuing the Society's mission. Each term of this contract will be interpreted in the context of these fundamental principles.

# Article 1/Labor Relations

**§ 1.1.          _UNION RECOGNITION AND AGENCY SHOP_**

    **§ 1.1.1.          _Recognition_**. In accordance with the Certification of Representation issued by the New York State Labor Relations Board on December 30, 1969, the Legal Aid Society ("Society" or "LAS") recognizes the Association of Legal Aid Attorneys, UAW Local 2325 (AFL-CIO) ("Union" or "ALAA") as the exclusive bargaining representative of all attorneys admitted to practice and within the scope of the bargaining unit definition contained in the above-mentioned Certification and of all law graduates employed as such by the Society ("Staff Attorneys").

    **§ 1.1.2.          _Union Membership_**. The Union agrees to continue its policy, as defined by law, of admitting persons to membership without discrimination on the basis of actual or perceived race, color, national origin, alienage or citizenship status, religion, creed, sex, gender (including "gender identity" -- which refers to a person's actual or perceived sex, and includes self-image, appearance, behavior or expression, whether or not different from that traditionally associated with the legal sex assigned to the person at birth), disability, age (18 and over), military status, prior record of arrest or conviction, marital status, genetic predisposition or carrier status, sexual orientation, or status as a victim of domestic violence, a sex offense or stalking, or membership in, or association with the activities of, any employee organization. No attorney will be required to join the Union.

    **§ 1.1.3.          _Dues and Fees_**. All bargaining unit members, whether newly-hired, rehired, or returned to the bargaining unit, must, within thirty [30] days of hire, pay the current dues and initiation fees or, where applicable, current service fees to the Union, and any interest charges that may be set by the Union for late payment of dues or service fees. Upon the Union's written request, the Society will discharge any Staff Attorney who fails to pay such dues, fees or interest, after the Union has given at least two [2] weeks' written notice, by certified mail, to the delinquent attorney and to the Society. Any member of the bargaining unit may authorize the Society to deduct from their paycheck(s) and forward to the Union all dues, initiation fees, credit union, political action, other assessments and/or agency fees. Such authorization will be effective until revoked, in writing, by the signer thereof.

**§ 1.2.          _COLLECTIVE BARGAINING AGREEMENT_**

    **§ 1.2.1.          _Term_**. This Agreement will be effective as of July 1, 2022, will continue in full force and effect through June 30, 2025, and will continue past its expiration date, subject to ten [10] days' written notice of termination by either party. As always, all terms and conditions, including salary, pension and all benefit obligations, will be subject to collective bargaining upon the expiration

date.

§ 1.2.2.    ***Negotiation***. When feasible, the parties will: 1) provide one hundred and twenty [120] days' notice prior to expiration of its intent to modify or terminate this Agreement; 2) present written proposals at least one hundred [100] days prior to expiration; 3) begin contract negotiations at least ninety [90] days prior to expiration; and 4) meet as frequently as necessary for a full and fair discussion of the issues. If there is no successor agreement at least forty-five [45] days prior to expiration, the parties will jointly request the intervention of the Federal Mediation and Conciliation Service.  If, in the mediator's judgment, maintenance of the status quo for a period of up to thirty [30] days past expiration appears likely to improve the chances for a negotiated agreement without declaration of an impasse, the mediator will ask the parties' agreement  to such extension, and/or to such other steps within that time period as they deem useful to resolve outstanding issues.

§ 1.2.3.    ***Headings and Terms***. Headings and/or subject groupings are for general identification only and will not be construed in a substantive manner.  The pronoun "they" will be deemed applicable to all genders.

§ 1.2.4.    ***Distribution***. The Society will distribute at least one (1) electronic copy to each attorney via email.

§ 1.3.    ***NO STRIKE OR LOCKOUT***.  The parties subscribe to the principle that differences will be resolved by peaceful and appropriate means without interruption of the work of the Society or the courts. The Union agrees that there will be no strikes, work stoppages, slowdowns or concerted refusal to perform work during the term of this Agreement, during which neither the Union, nor any officer or agent thereof will, directly or indirectly, authorize, assist, condone, encourage, or in any way participate in any such activities. The Society will not lockout its employees during the term of this Agreement.

§ 1.4.    ***UNION ACCESS TO FINANCIAL RECORDS***. The Society will grant any reasonable request by the Union for open access to its financial books and records, subject to appropriate safeguards against release or other inappropriate use of individually-identifiable information about non-bargaining unit employees, including access to outside auditors in regard to the Society's financial condition and to perform due diligence in regard thereto.

§ 1.5.    ***UNION ACTIVITIES***.  The Union will have reasonable use of the Society's internal communication mechanisms and meeting space and up to 1.5 full time equivalent (FTE) of paid release time for general representational and related duties, and reasonable release time for other Union representatives, and other resources necessary to administer this Agreement.

Three [3] LAS Staff Attorneys may take unpaid leaves for an unlimited duration to serve on Union staff, during which they will be entitled to all benefits (health, disability, etc.) available to other bargaining unit members, at no additional cost to the Society.  Attorneys on Union leave will accrue full seniority for all purposes, including salary, vacation, pension, and leave, and have the right to return to their position within their Practice and borough/office absent a compelling Society need. Current Union staff whose leave had previously expired shall be immediately restored to their status

as Society employees on the above terms.

Reasonable use of the Society's internal communication mechanisms shall be interpreted to mean the following: The Legal Aid Society will maintain an e-mail group that permits the President of ALAA and their designee to send communications to all ALAA members and permits individual members to respond to the President of ALAA and their designee as the sender(s) and not to the whole e-mail group. The Legal Aid Society has provided ALAA with a one-time payment of $12,000 so that ALAA can develop and implement a free-standing e-mail group of ALAA members that is not on The Legal Aid Society's computer network.

**§ 1.6.       _PRESENCE OF UNION REPRESENTATIVES_**. Staff Attorneys may exercise their right to the presence of a Union representative, whenever practicable a person of their choice, during any discussion with managers concerning potential or actual disciplinary action.

**§ 1.7.       _JOINT UNION-MANGEMENT COMMITTEES_**. The Union will appoint its representatives to all "Union-Management" committees.

**§ 1.8.       _GRIEVANCES_**.  Except as otherwise provided herein, the following grievance procedure will apply to all disputes concerning interpretation or application of a specific provision of this Agreement.

**§ 1.8.1.      _Initiation_**.  Grievances must be filed in writing within fifteen [15] calendar days of the event giving rise to the grievance, or within fifteen [15] calendar days from when the event, with reasonable diligence, should have become known.  The written statement must be sufficient to give notice that the matter is being grieved and should clearly articulate the issue(s) grieved, the relevant contract provision(s), and the relief sought.

**§ 1.8.2.      _Time Limits_**. Once filed, each subsequent step in the grievance process must be completed or initiated, as appropriate, within fifteen [15] calendar days of the preceding event, except as extended by the parties' mutual agreement, which shall not be unreasonably withheld.  If the Union fails to file within the allotted time, the grievance will be deemed resolved by the Society's most recent position.  If the Society fails to respond within the allotted time, the Union may move the grievance to the next level.

**§ 1.8.3.      _Presentation_**.  Grievances will be presented and processed at a time and in a manner that does not materially interfere with work.  Unless otherwise agreed, grievances will be heard during normal work hours.

**§ 1.8.4.      _Due Process_**.  Except in cases involving dishonesty or gross neglect of a client, no Staff Attorney will be discharged until completion of the First Step grievance process, until the grievance has been resolved by operation of time limits, or until the Staff Attorney has given written notice that they do not intend to file a grievance with respect to a proposed termination. The foregoing does not prevent the Society from placing a Staff Attorney on paid suspension pending resolution of the First Step grievance.  A proposal to suspend or discharge a Staff Attorney must be

made in a written notice of charges provided simultaneously to the Staff Attorney and Union President. Notice of charges may be amended or supplemented at any subsequent time, with the understanding that such changes may require an extension of time limits for further investigation. The Union may present documents relevant to the grievance and may present witnesses with relevant personal knowledge, subject to the discretion of the manager who hears the grievance to exercise reasonable control over the number, mode, and order of examining witnesses and presenting evidence so as to make the procedure effective for determining the truth and avoid the needless consumption of time. If any evidence (documentary or testimonial) is excluded by Management, ALAA shall have the right to ask that the excluded evidence be considered in any subsequent appeals.

§ 1.8.5.    *Steps*

(1)    *First Step:  Immediate Supervisor,*  The First Step grievance will generally be to the immediate supervisor. If the action being grieved is discipline or termination taken in the name of a higher level supervisor, the First Step grievance will be to that person. The parties will seek resolution through discussion among the aggrieved Staff Attorney, their Union representative, or, in the appropriate case, the Union as the aggrieved party, and the aggrieved's immediate supervisor, who will issue a written decision.

(2)    *Second Step:  Practice Chief Attorney.*  If the grievance is not settled in the First Step, the Union may file a written appeal to the Chief Attorney of the practice to which the grieving Staff Attorney is assigned, or was assigned at the relevant time. Following a meeting among the interested parties, the Chief Attorney will issue a written decision. If the practice Chief Attorney decided the First Step grievance, their initial decision will be appealed directly to the Third Step.

(3)    *Third Step: Attorney-in-Chief.*  If the grievance is not settled in the Second Step, the Union may file a written appeal to the Attorney-in-Chief, who, following a meeting among the interested parties, will issue a written decision.

(4)    *Fourth Step: Arbitration*.  If the grievance is not settled in the Third Step, the Union may give written notice of arbitration to the Attorney-in-Chief. If the parties are unable to agree on an arbitrator within an additional fifteen [15] calendar days of such notice, the matter will be submitted to arbitration under American Arbitration Association rules, in the event of discharge on an expedited basis. The arbitrator's award will be final and binding on all parties. The Union and the Society will share equally in any costs of grievance arbitration.

§ 1.8.6.    *Exclusive Remedy*.  No Staff Attorney will have the right to independently institute or pursue any grievance or arbitration based upon this Agreement, the right of action being limited to the Union and the Society, and any agreement or adjustment between the Union and the Society with respect to such disputes will be final and binding upon the Staff Attorney.

§ 1.9.    *MANAGEMENT RIGHTS*. The Society will at all times, subject to express provisions of this Agreement, have full control of management, personnel, and conduct of its operations,

including any of the rights, powers and authority that the Society had prior to the signing of this Agreement.

**§ 1.10.**      ***FUTURE JOINT LOBBYING***. If there is any future joint lobbying, a plan for such future joint lobbying will be addressed in a side letter between the parties.

# Article 2/Compensation

## § 2.1.    *SALARY*

**§ 2.1.1.    *Salary Schedule*.**  The Basic Salary Schedule set forth in Appendix A will apply to all Staff Attorneys and be effective July 1, 2022 through June 30, 2025. See Appendix C and D for Memoranda of Agreement dated March 31, 2023 and August 18, 2023 applying to Fiscal Year 2023. In accordance with the Society's salary payroll procedures, all salary increases, including retroactive salary increases, are subject to applicable payroll deductions and are pensionable. For Fiscal Year 2024, within thirty (30) days of ratification, the Society will increase the salary of each Staff Attorney in active status at that time in accordance with the levels specified in Appendix A and provide the first half of the retroactive payment to each such Staff Attorney reflecting the Staff Attorney's salary increase effective on July 1, 2023 in accordance with the salary levels set forth in Appendix A. Staff attorneys who commenced employment at the Society after July 1, 2023 will receive salary increases in accordance with the levels specified in Appendix A based on the pro-rated amount of their annual base salary for their time in active status since July 1, 2023. The retroactive portion of this salary increase will be disbursed as separate payments. Staff Attorneys in active status will receive the first retroactive portion payment on January 12, 2024 and will receive the second retroactive portion payment no later than March 15, 2024. For each Staff Attorney who is on an authorized leave when the Society implements the prospective and retroactive salary increase at the levels set forth in Appendix A, the Society will make retroactive salary adjustments, if any are required, within thirty (30) days of the Staff Attorney's return from the authorized leave. For Fiscal Year 2025, the Society will implement the increase for the salary of each Staff Attorney in active status in accordance with the levels specified in Appendix A beginning July 1, 2024. No later than 30 days prior to July 1, 2024, the Society agrees to reopen bargaining for the purpose of negotiating increases to wages for Fiscal Year 2025. The Basic Salary Schedule may be increased during the term of this Agreement in accord with the above provision.

**§ 2.1.1.1.    *ADA Comparability*.**  Both ALAA and LAS recognize and support a goal that staff attorneys receive total compensation which is comparable to that received by ADAs in Bronx, Brooklyn, New York and Queens Counties and that, due to the lack of sufficient funding, the economic terms contained herein narrows, but does not close, the comparability gap between the two groups. It is also recognized that LAS may receive funding increase(s) during the term of this contract which would allow it to narrow or close this gap.  To that end, the parties agree that should the LAS receive, during the term of this contract, a funding increase sufficient to further narrow or close the comparability gap, the parties will, immediately upon learning of such increase, undertake to ascertain the four-borough  average of total compensation received by non-managerial ADAs at yearly levels of service.  After ascertaining such ADA compensation, LAS agrees to pay staff attorneys as close to comparable total compensation  as such additional  funding allows.

**§ 2.1.1.2.   _Special Wage Reopener-Alternative Defender Organizations_**. If any organization other than the 18-B (assigned counsel) panel offers to furnish defender services for ten [10] percent or more of the clients served by the Criminal Practice or Juvenile Rights Practice in the City and/or State Courts in New York City, and if such organization offers to its Staff Attorneys, on an overall basis, higher salaries, superior terms of employment or working conditions, the Union may, upon ninety [90] days' written notice to the Attorney-in-Chief, reopen the contract as to those items where disparity exists. If the Society challenges the factual basis on which the reopener notice is predicated, such issue(s) will be submitted to arbitration and the relevant contract provision reopened only upon an appropriate finding by the arbitrator.

**§ 2.1.1.3.   _24-Pay Period System_**. Effective April 1, 2012, the Society is implementing a 24 pay period system for each year that consists of two pay days per month on the 15th and on the last day of the month. When the 15th or the last day of the month falls on a weekend or holiday, the pay day will be on the business day immediately before the weekend or holiday. Converting to the 24 pay period system will not affect the current negotiated annual step rates, but will increase the amount of the gross amount of pay per payroll period so that the gross annual salary remains the same in the 24 pay period system as it had been in the 26 pay period system.

### § 2.1.2.   _Individual Placement on Salary Scale_

**§ 2.1.2.1.   _Anniversary Date_**. The anniversary date will be the date of first employment as a Staff Attorney. The Society, in consultation with the Union in regard to criteria and principles, may give credit for prior experience or service, and those hired with such credit will receive future increases based on their hiring level rather than their years of service with the Society. In the event of a break in service, any credit for prior service to establish salary, annual leave, retirement benefits, seniority, etc., will be as agreed upon by the Society and the attorney upon rehire.

**§ 2.1.2.2.   _Advancement to Step One_**. Movement on the Salary Schedule from Law Graduate to Step 1 will be effective on bar admission.

**§ 2.1.2.3.   _Returned-to-Staff Supervisors_**. Staff Attorneys who returned to staff from supervisory positions will be entitled to credit for all their experience as an attorney employed by the Society, including the time employed as a supervisory attorney.

**§ 2.1.3.   _Lobster Shift_**. Attorneys working the New York County "lobster" shift that begins at 1:00 A.M. will be paid at the following rate: Tuesday-Friday—$300; Sunday and the day following a holiday—$400; Saturday, Monday and holidays—$350. Attorneys staffing the lobster shift will not be required to work the shift immediately prior or subsequent thereto.

**§ 2.2.   _TRANSITCHEKS_**. Effective July 1, 2004, each Staff Attorney will have the individual option to use pre-tax compensation to purchase TransitCheks as administratively practical within the maximum amount permitted by law.

**§ 2.3.** ***BAR REGISTRATION FEE***. The Society will pay Staff Attorney bar registration fees.

**§ 2.4.** ***FELLOWSHIPS***. The Society may transmit or facilitate payments by fellowships for repayment of Staff Attorney education loans.

**§ 2.5.** ***LOAN ASSISTANCE***. This section is the subject of an on-going grievance filed by ALAA on February 28, 2024.

**§ 2.5.1.** ***Loan Assistance Committee***. The Union and the Society agree to establish a joint Union-Management committee to make recommendations for educational loan reimbursements of the funds currently in the Archibald Murray Fund and to explore additional strategies for raising funds for educational loan reimbursement.

**§ 2.6.** ***BAR ASSOCIATION DUES***. To the extent that recurring funds can be allocated, the Attorney-in-Chief will appoint managers and Staff Attorneys to serve as a representative of The Legal Aid Society on relevant State and local bar association committees, with the required bar dues paid with such funds. Any appointments of Staff Attorneys will be made in consultation with the Association of Legal Aid Attorneys through its President.

**§ 2.7.** ***COMPENSATORY, PERSONAL AND FLEX TIME***

**§ 2.7.1.** ***Compensatory Time (Criminal Defense Practice)***

**§ 2.7.1.1.** ***Earnings***. Staff Attorneys in the Criminal Defense Practice will earn compensatory time for working certain institutional assignments outside of regular working hours. Staff Attorneys in the Community Justice Unit will be permitted to earn comp time for institutional assignments performed beyond the normal workday of 9 A.M. to 5 P.M. Staff Attorneys in the Homicide Defense Task Force ("HDTF") will be permitted to earn compensatory time for intake assignments.

**§ 2.7.1.2.** ***Accumulation and Use***. Staff Attorneys may accumulate accrued compensatory days. Accumulated days may be taken as vacation in accordance with the CBA within one year of being earned but may not be carried over to a subsequent year.

For compensatory time earned, Criminal Defense Practice Staff Attorneys may opt to be paid at their regular hourly rate, to a maximum of thirty [30] compensatory days in a fiscal year. Such payments are not pensionable.

If the member moves to a non-ALAA position, and the compensatory time they earned as a Staff Attorney is paid out after they have moved into the new position, the compensatory time will be paid out at the regularly hourly rate in effect when the compensatory time was earned.

For institutional assignments worked on major holidays, Criminal Defense Practice Staff Attorneys

will earn time and a half, either 1.5 times pay if paid out or 1.5 times hours of the shift in compensatory time.

Criminal Defense Practice Staff Attorneys may opt to be paid out for any compensatory time earned within the current fiscal year during the duration of that fiscal year.

Homicide Defense Task Force ("HDTF") Staff Attorneys are eligible to earn compensatory time for institutional assignments performed beyond the normal workday of 9 AM to 5 PM following the model of the Community Justice Unit (CJU):

- One half [0.5] day for a weekday intake shift

- One [1] day for a weekday intake shift if they have to report to a precinct for a lineup or surrender or report to a courthouse to interview a client and/or arraign a case

- One [1] day for a weekend day shift (9am - 5pm) and one [1] day for a weekend night shift (5pm - 1am)

Homicide Certified Staff Attorneys in the Criminal Defense Practice can earn compensatory time outside of their regularly scheduled institutional assignments:

- One [1] day if they have to report to a precinct for a lineup or surrender or report to a courthouse to interview a client and/or arraign a homicide case.

§ 2.7.1.3.   **_Cash-In_**. Effective December 19, 2006, for unpaid leaves in the Criminal Defense practice, other than compensatory time that can be cashed in annually pursuant to paragraph 2.5.1.2, above, Criminal Defense staff compensatory time accumulated prior to April 1, 2005 will be paid out in a lump sum when a Criminal Defense staff attorney resigns or is terminated from LAS, is promoted to a supervisor, or transfers from the Criminal Defense practice. However, in order to reduce the accumulated April 1, 2005 compensatory time liability for the Society and to provide a transition for affected bargaining unit members taking unpaid leaves related to childcare and/or FMLA, on a fiscal year basis, the Society is allocating a fund of up to $250,000 to pay out accumulated pre-April 1, 2005 compensatory time to such affected Criminal Defense attorneys on unpaid leave in a lump sum that represents the duration of the leave and such staff attorneys will be permitted to pay for health care coverage at the applicable employee share while they are on such approved unpaid leave.

§ 2.7.1.4.   **_Frozen Compensatory Time_**. Attorneys with pre-2005 "frozen" comp days will be allowed to sell back up to 15 days each year.

§ 2.7.1.5.   **_Modification_**. The Society may establish reasonable notice requirements in regard to exercise by Staff Attorneys of their right to cash in compensatory days and reasonable payment provisions, not more than two [2] months after such notification, in order to prevent cash-flow problems for the Society.

§ 2.7.1.6.   **_Weekend and Holiday Arraignments in the Juvenile Rights Practice_**. Staff Attorneys in the Juvenile Rights Practice will be paid for a compensatory day for

working a weekend or holiday arraignment shift, with such payment to be provided no later than on the second pay day following the shift that the Staff Attorney worked.

§ 2.7.2.    ***Personal Days (Other Practices)***. Each full-time and part-time Staff Attorney in the Civil Practice, Special Litigation Unit of the Criminal Practice, Juvenile Rights Practice, and Criminal Appeals Bureau will receive five [5] personal days per calendar year, except that staff attorneys in the Criminal Appeals Bureau will receive no personal days as of the end of calendar year 2006; such days cannot be cashed-in or carried over from year to year. Effective January 1, 2007, the allocation of personal days for staff who work part time and are otherwise eligible for personal days shall be pro-rated.

§ 2.7.3.    ***Special Longevity Personal Days***. LAS will provide a special longevity allocation of five [5] personal days for use either in the longevity year or in the subsequent years until the next longevity anniversary date: 1) 25 years of service; 2) 30 years of service; 3) 35 years of service; 4) 40 years of service; 5) 45 years of service; and (6) subsequent five [5] year intervals of service. Members who reach 25 years of service following 12/15/2023 will be provided with a special longevity allocation when they reach 25 years of service. These special longevity allocations of five [5] personal days shall not affect the limitations on the accrual of vacation days, the use of compensatory time, or the annual allocation of personal days for eligible Staff Attorneys.

§ 2.7.4.    ***Flexible Hours***. The Society will continue to make reasonable adjustments in attorneys' hours at the workplace, subject to the demands of workload coverage, in consideration of such assignments as night-time tenant or other group meetings concerning clients, jury deliberations, late court time, line-ups, etc.

## § 2.8.    ***HEALTH INSURANCE***

§ 2.8.1.    ***Administration***. Staff Attorney health benefits will be administered by the Society, with full Union access to all information concerning terms, costs, administration and application of those benefits to bargaining unit members. Summary of Benefit documents are available on the Benefits and Compensation page of HR's LION site (https://legalaidnyc.sharepoint.com/sites/HRBenefitsandCompensation) and in Appendix B. A Joint Union-Management Health Benefits Committee will be established to discuss issues and concerns regarding administration of the benefit program. Effective January 1, 2008, co-payments for medical office visits shall be $20.

§ 2.8.2.    ***Changes***. There will be no change in any benefit without the Union's agreement. If the Society's cost for Staff Attorney health benefits decreases during the term of the Collective Bargaining Agreement, disposition of the resulting savings will be discussed with the Union.

§ 2.8.2.1.    ***Contributions***. Effective January 1, 2005, ALAA members will make contributions to health care premiums in the amount of 3.5 percent of premium for the "low plan" and 7 percent for the "high plan".

### § 2.8.3.    _Eligibility_

§ 2.8.3.1.    _Employment_. Health insurance coverage is effective on the first of the month following a member's date of hire.  Coverage will cease as of the last day of the month in which a member separates employment, subject to continued benefits under applicable law and insurance policies.

§ 2.8.3.2.    _Dependents_. Employees wishing to change from single to dependent coverage, and new enrollees requesting dependent coverage, will be required to provide documentation of the qualifying event as required by Legal Aid's health care provider.

§ 2.8.3.3.    _Lesbian and Gay Partners_. The Society will provide health insurance coverage for domestic partners of lesbian and gay Staff Attorneys who sign an affirmation attesting to their relationship with a named domestic partner (qualifying standards for which will be taken from language contained in the New York City Executive Order), subject to availability, to reasonable eligibility requirements and to costs comparable with those incurred under then-current health insurance.  The Society will take all reasonable steps, excluding litigation, to bring about and maintain availability of such coverage.

§ 2.8.3.3.1. _Tax Reimbursement for Staff Attorneys with Same Sex Domestic Partners_. In recognition of the added tax burden that results from the disparate treatment in federal and state tax laws of married heterosexual couples and same sex domestic partners, a Staff Attorney whose health insurance coverage is for themself and a domestic partner shall be reimbursed in accordance with either one of these options: (a) the Staff Attorney will be reimbursed in an amount equivalent to 20% of the cost of the additional coverage for the domestic partner; or (b) LAS will "Gross Up" the tax liability such that the Staff Attorney shall be reimbursed in a net amount equivalent to the tax liability incurred by the Staff Attorney as a result of the treatment of the additional premium as income to the Staff Attorney.  If this second option is chosen, the Staff Attorney shall demonstrate the additional tax liability by providing exact copies of the filed tax returns of the Staff Attorney and the domestic partner, as well as a tax return prepared as a joint return for a couple that would be treated as married under the tax laws.  The tax returns shall be accompanied by an affirmation from the Staff Attorneys attesting to their financial accuracy. Reimbursement under either option (a) or (b) shall be paid within 60 days of receipt of the required documentation by the LAS Human Resources Department.  Any tax liability resulting from the reimbursements for employees who select option (a) shall be the responsibility of the Staff Attorney. At such time as the tax laws are modified to eliminate this disparate treatment which this provision is being adopted to address, this provision will expire.

§ 2.8.3.4.    _Enrollment_. Each Staff Attorney may select from health plan options detailed in the Summary of Benefits available on the Benefits and Compensation page of the HR LION site (https://legalaidnyc.sharepoint.com/sites/HRBenefitsandCompensation) and in Appendix B, or as may be otherwise agreed upon by the Union and the Society, during an annual open enrollment period, and/or throughout the year due to qualifying changes in family status.

§ 2.8.3.5.    _Retirees_. Effective July 1, 2002, a Medicare supplement with

prescription drug rider will be provided to Staff Attorneys who: (1) retire on or after July 1, 2002; (2) have been employed by The Legal Aid Society for 25 years or more (time spent on long-term disability will be included in determining this period); and (3) will at retirement have reached age 65. A dependent of a retiree may purchase at the dependent's expense the same Medicare supplement with a prescription drug rider that will be provided to staff attorney retirees. If the dependent is not Medicare eligible, the dependent may purchase at the dependent's expense LAS health care coverage that is provided to staff attorneys. Retiree health care coverage is limited to retirees who are not eligible for health care coverage from another employer or former employer, and the ability of a retiree's dependent to purchase a Medicare supplement or LAS health care coverage is similarly limited.

§ 2.8.3.5.1. *__Medigap Insurance for Retirees__*. Part F or G, whichever is applicable, is offered to retirees in locations which offer the Advantage Plan, provided that retirees electing Part F or G will be required to pay the difference in the premium between Plan F or G and the Advantage Plan for their location.

§ 2.8.3.6. *__Opt Out__*. LAS will implement a health care opt-out plan to provide a $2,500 annual incentive to Staff Attorneys who opt out of annual health care coverage provided that they submit written documentation demonstrating that they are covered for that year by another health care insurance plan.

§ 2.9. *__LIFE INSURANCE__*. The Society will provide Staff Attorneys with life insurance as detailed in Appendix B and will permit Staff Attorneys to voluntarily purchase additional group life insurance through check off, subject to the carrier's requirements.

§ 2.10. *__PENSION__*. The Society will, no later than four [4] months from the close of the respective quarterly evaluation period, contribute 6.5% of covered salary, as defined in the Pension Trust Agreement and Pension Plan, to the Legal Aid Society Staff Attorney Pension Plan. Actual out-of-pocket expenses for legal counsel (not to exceed $50,000 per Plan year), consultants, accountants or others retained by the Plan will be payable from the Society's contributions. LAS shall make quarterly pension payments by January 31st, April 30th, July 31st, and October 31st of each year. The LAS pension contributions to the Legal Aid Staff Attorney Pension Plan that are due and payable in Fiscal Year 2006 (July I, 2005- June 30, 2006) shall be reduced to 3 percent of covered salary as defined by the Pension Trust Agreement and Pension Plan. Effective December 2004, ALAA hereby waives its claim based on LAS' alleged failure to make timely pension fund payments to the Legal Aid Staff Attorney Pension Plan prior to December 2004 in the amount of $381,000.

§ 2.11. *__TAX SHELTERS__*. The Society will make all necessary efforts to establish, maintain and offer to Staff Attorneys IRS-qualified plans for tax-deferred and/or tax-exempt annuities (overseen by a joint Union-Management committee of equal number), dependent care, excess unreimbursed medical expenses, health insurance premium contributions and long-term disability payments. The Society will arrange for a vendor to offer a Roth 403(b) to Staff Attorneys. The Society will provide an additional payroll deduction option for a New York State 529 Educational

Savings Plan. Effective January 1, 2014, the Society will waive the administrative costs for flexible spending and dependent care accounts.

### § 2.12.    *VACATION*

§ 2.12.1.    ***Amount***. Staff Attorneys will receive annual leave with pay for vacation and religious observance in the amount of twenty [20] workdays for the first year of service; twenty- three [23] workdays for the second and third years of service; and twenty-seven [27] workdays for the fourth and subsequent years of service.

§ 2.12.2.    ***Eligibility***. Annual leave (except for religious holidays) will not ordinarily be granted until a Staff Attorney has been employed for at least six [6] months.  Within the first six [6] months, staff may request approval from their supervisors to use accrued vacation time as an exception to this policy which, consistent with work demands, shall not be unreasonably denied. During this 6-month time period, staff remain eligible to use personal days and floating holidays for which they qualify.

§ 2.12.3.    ***Accrual***. Annual leave will be earned on an accrual basis calculated from employment anniversary date on the basis of one and two-thirds [1 2/3] days per month during the first year of employment; one and eleven-twelfths [1 11/12] days during the second and third years; and two and one-quarter [2 1/4] thereafter. By June 1 of each year, each Staff Attorney will be provided with a statement of their accrued vacation as of May 1 and/or when their respective accruals reach thirty-five [35] days.

§ 2.12.4.    ***Paychecks***. Paychecks due during vacation will be available on the last working day prior to the vacation, provided that the Society is given three [3] weeks' notice of any change in scheduled vacation.

§ 2.12.5.    ***Scheduling***. Vacation schedules will be subject to office and practice staffing requirements.

§ 2.12.6.    ***Illness or Accident***. If a Staff Attorney becomes ill or suffers an accident during a period of vacation, the Society will exercise reasonable discretion in converting vacation time to sick time.

§ 2.12.7.    ***Buy-Back***. Each full-time and part-time Staff Attorney in the Civil Practice, Juvenile Rights Practice, Parole Revocation Defense Unit and Special Litigation Unit of the Criminal Practice will have the option of selling back up to five [5] vacation days per calendar year and staff attorneys in the Criminal Appeals Bureau may sell back up to 10 vacation days per calendar year, to be paid at the rate in effect on June 30. Provided during the period July 1, 2004 through June 30, 2005 Staff Attorneys shall not have the right of selling back any vacation time during this year. Criminal Trials Staff Attorneys in the Staten Island Criminal Defense Practice Office are eligible to buy-back vacation days per fiscal year minus the number of compensatory days bought back up to the equivalent number of days as Criminal Trials Staff Attorneys in other CDP offices. The increase

from 20 days to 30 days will be implemented beginning with vacation buy-back in calendar year 2024.

§ 2.12.8.    *Forfeiture*. The Legal Aid Society fiscal year ends on June 30. On July 1, any vacation time accrued in excess of 1.5 times your annual vacation accrual maximums will be moved into a "vacation overflow balance". This time must be used on or before December 31 of that year to avoid forfeiture of the hours. There will be a grace period for Staff Attorneys who forfeit accrued vacation time as a result of canceled scheduled vacation(s) due to scheduling beyond their control of trials, pre-trial hearings or appellate arguments.

§ 2.12.9.    *Restoration of 1995 Vacation Accruals*. Effective January 1, 2004, the Society will restore the maximum vacation time accrual to all Staff Attorneys who in 1995 reduced their maximum vacation time accrual.

§ 2.13.    *ADOPTION & FERTILITY TREATMENTS*. The Society will create a fund of $300,000 each year in order to offer financial assistance for adoption and the costs not covered by insurance to establish fertility at a maximum reimbursement of $15,000 per attorney.

§ 2.14.    *CHILDCARE*. Management will create a committee to explore the feasibility, cost and potential liability issues regarding the provision of childcare services or a childcare subsidy.

§ 2.15.    *VACATION DONATION*. We agree to create an employer sponsored vacation sharing plan that, consistent with IRS regulations, allows union members to deposit unused vacation time in an LAS sponsored leave bank for use by any other staff members, including ALAA, 1199 and non-union staff, if the staff member has exhausted all other paid leave and either (1) has a family member who is facing a medical emergency, or (2) is adversely affected by a major disaster. A medical emergency is defined as a medical condition of a family member of the employee that will require the prolonged absence of the employee from duty and will result in a substantial loss of income to the employee due to the exhaustion of all paid leave available. A "family member" is defined a spouse, domestic partner, child or parent. A major disaster is defined as a disaster declared by the president under §401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act. An employee is considered to be adversely affected by a major disaster if the disaster has caused severe hardship to the employee or to a family member of the employee.

§ 2.16.    *VISION BENEFITS*. Frame coverage is $200.

§ 2.17.    *DENTAL BENEFITS*. The lifetime orthodontic benefit is $2,500.

# Article 3/Employment Policy

## § 3.1.    *FAIR EMPLOYMENT PRACTICES*

### § 3.1.1.    *Non-Discrimination*.    The Society will continue its policy of not discriminating, as defined by law, against an employee on the basis of actual or perceived race, color, national origin, alienage or citizenship status, religion, creed, sex, gender (including "gender identity" --which refers to a person's actual or perceived sex, and includes self-image, appearance, behavior or expression, whether or not different from that traditionally associated with the legal sex assigned to the person at birth), disability, age (18 and over), military status, prior record of arrest or conviction, marital status, genetic predisposition or carrier status, sexual orientation, or status as a victim of domestic violence, a sex offense or stalking, or membership in, or association with the activities of, any employee organization. The Joint Union-Management Staff Attorneys Affirmative Action and Diversity Committee provided for herein will establish written procedures to resolve bargaining unit discrimination complaints. Such procedures will include following elements:

#### § 3.1.1.1.    *Individual Options*. If both the complainant and the target of the complainant voluntarily agree, they may submit to voluntary mediation. The Joint Union-Management Staff Attorney Affirmative Action and Diversity Committee will recommend to the Attorney-in-Chief a diverse panel of qualified mediators. When investigation of a complaint is required, the investigation will be conducted by Human Resources Department staff or outside counsel with appropriation experience and training consistent with EEOC guidance.

#### § 3.1.1.2.    *Confidentiality*. Information about the complaint will not be revealed except as required to complete a full and fair investigation and/or to attempt resolution.

#### § 3.1.1.3.    *Due Process*. Employees accused of discrimination will have a full and fair opportunity to respond to the accusation. Both accuser and accused will be entitled to representation in the proceeding.

#### § 3.1.1.4.    *Recommendation*. Individuals found to have engaged in discriminatory conduct will be disciplined up to and including possible termination.

#### § 3.1.1.5.    *Retaliation*. Complainants and witnesses will be fully protected against retaliation.

#### § 3.1.1.6.    *Alternate Remedies*. None of the provisions of this mechanism precludes access to other discrimination remedies.

### § 3.1.2.    *Affirmative Action*. The Legal Aid Society will continue to pursue affirmative action and diversity with regard to race, ethnicity, age, gender, sex, sexual orientation and

disability and to pursue a truly inclusive workplace where colleagues of diverse backgrounds and lifestyles feel accepted, respected and encouraged to grow professionally. The Society recognizes that, given the high degree of diversity of its client population, it has a responsibility to continue its affirmative action efforts, in accordance with ABA standards, beyond simply meeting traditional utilization measures for the relevant labor pool. The Society will also continue to pursue diversity with respect to skills in languages commonly-spoken by the Society's eligible client population. Diversity will be considered a relevant criterion in hiring and selection decisions. The Joint Union-Management Affirmative Action and Diversity Committee will refine and articulate more specific objectives and strategies through the affirmative action planning process.

§ **3.1.2.1.** _**Discussion**_. The Society will consider and respond to the Union's concerns in regard to affirmative action, and the Union will participate in development of the annual Staff Attorneys' Affirmative Action Plan described below.

§ **3.1.2.2.** _**Joint Union-Management Staff Attorneys Affirmative Action And Diversity Committee**_. There will be a Joint Union-Management Staff Attorneys Affirmative Action and Diversity Committee consisting of the Attorney-in-Chief, the Chief Attorneys of the Civil, Criminal, and Juvenile Rights Practices, the Society's Diversity Officer, the Society's Chief Human Resources Officer, and another representative of the Society's senior management, and the President of ALAA and six [6] ALAA representatives (including representatives of each Practice, a representative of the Attorneys of Color Caucus of Legal Aid, a representative of the Black Attorneys of Legal Aid caucus, a representative of the LGBTQ caucus, and the ALAA Affirmative Action Representative). The Committee will be co-chaired by the Attorney-in-Chief or their designee and the ALAA President or their designee. The purpose of the Committee is to foster workforce diversity in the bargaining unit, with particular reference to recruitment, retention and promotion of people of color, women, and a diverse staff as described in § 3.1.1. The Committee will meet on the second Wednesday of each quarter. The Committee will develop, monitor and evaluate an annual Affirmative Action and Diversity Plan, as described below, which will be the focal point around which these efforts are organized. Based on the annual plan, the Society will periodically post and maintain Affirmative Action and Diversity data and information on its Website.

§ **3.1.2.3.** _**Society Resources**_. The Society will provide staff support for implementation of the Affirmative Action and Diversity Plan, and will maintain one [1] full-time Diversity Officer and appropriate supporting staff, whose principal responsibilities will include affirmative action and diversity. The Diversity Officer will report to the Attorney-in-Chief.

§ **3.1.2.4.** _**Practice Committees**_. Practice Joint Union-Management Staff Attorney Affirmative Action and Diversity committees will be established at the initiative of either party to address concerns unique to the Practice.

§ **3.1.2.5.** _**Plan**_. The Society-wide Union-Management Staff Attorney Affirmative Action and Diversity Committee will develop an annual Staff Attorney Affirmative Action and Diversity Plan to foster workforce diversity. The plan will include the following components:

**§ 3.1.2.5.1. *Statistics***. The Attorney-in-Chief will timely maintain statistics in a consistent format necessary to support the affirmative action objectives of the Society and the Committee's work. Statistics will include, but not be limited to, recruitment, promotion and retention profiles for all protected classes as defined under the Federal EEO-1 process as well as other groups included in § 3.1.1. Data will be collected, retained and reported for each organizational unit and for the bargaining unit as a whole. This information will be included in each annual Staff Attorneys Affirmative Action and Diversity Plan, will be used as an analytical tool for identifying areas in need of particular attention in that year's plan, and will be used for determining progress relative to prior years' plans. This information will be regularly distributed and made available to the Union upon request.

**§ 3.1.2.5.2. *Recruitment***. The Attorney-in-Chief will provide a recruitment plan to comply with the goals of the Committee prior to each recruitment period. The Affirmative Action and Diversity Plan will include strategies to foster diversity in recruiting for bargaining unit positions. At a minimum, the Plan will provide for: 1) emphasis in recruiting notices, literature and presentations on affirmative action and workforce diversity as a significant Society value; 2) strategies for expediting job offers as early as possible before January 1, in order to compete more effectively for highly qualified and highly diverse entering classes; 3) continued diversity of attorneys who participate in the interview and follow-up processes in each practice, with particular emphasis on increasing the participation of attorneys described in § 3.1.1 in interviewing applicants; and 4) broad outreach in selecting locations for special recruitment efforts.

**§ 3.1.2.5.3. *Retention***. The Affirmative Action and Diversity Plan will include ongoing strategies to recognize and eliminate institutional or personal barriers to retention of a diverse workforce. The Attorney-in-Chief will report retention data to the Committee, and identify institutional barriers that lead to the attrition of diverse attorneys. At a minimum, these strategies will include mandatory diversity training or similar programs for attorneys and managers to address the issues listed above.

**§ 3.1.2.5.4. *Promotion***. The Affirmative Action and Diversity Plan will include strategies to assess and convey supervisory potential of bargaining unit members and to develop their supervisory skills, with special emphasis on reaching attorneys of color, women, and other groups included in § 3.1.1, and on addressing issues of particular concern to their career development.

**§ 3.1.2.5.5. *Vacancies***. The Society will post and forward to the Union all Staff Attorney and Supervisory vacancies.

**§ 3.2.     *HIRING***. Consistent with the goals and procedures discussed above ("Fair Employment Practices"), each practice will establish a joint Union-Management committee to ensure Staff Attorney participation in regard to Staff Attorney and attorney management hiring. This committee should ensure that practices are consistent between the practice areas while also accommodating the specific needs of each practice. This committee should also work on strengthening bonds between Historically Black Colleges and Universities (HBCUs) and other academic institutions that match the

values of The Legal Aid Society.

## § 3.3.        *EMPLOYMENT STATUS*

**§ 3.3.1.        *Probationary Period*.** During the first eight [8] months of employment, the employment relationship will be considered probationary and may be terminated upon one [1] month's notice with a statement of the reason for termination with recourse to the grievance procedure but not to subsequent arbitration.  At the end of four [4], six [6], and eight [8] months of employment, the new attorney must be evaluated by their supervisor and receive a written report identifying those areas in which the employee should improve their professional performance. At the end of eight [8] months of employment, the probationary period will end, unless the supervisor, upon written notice to the attorney, extends probation by another four [4] months.  The notice shall identify the particular reasons for the extension, and where appropriate shall identify the particular areas in need of improvement based on the previous evaluations and then-current concerns. Extension of the probationary period shall be subject to the grievance procedure, but not to subsequent arbitration.  The probationary period may be extended a second time only in extraordinary circumstances, such as the excused absence of the probationary employee for such a lengthy period of time that the supervisor is unable to evaluate them.

**§ 3.3.2.        *Bar Examination*.** A law graduate will not be discharged solely for a first failure to pass the bar examination.  The Society will provide days off for those taking the bar for a second time, in order to permit participation in the Society-sponsored bar review course, the length and content of which will be determined by the Society in consultation with the Union.  With respect to a law graduate whose employment is terminated because of their second failure to pass the bar examination, one [1] month's notice of termination will be deemed to have been given on the third day following the date on the notice of bar examination results issued to the law graduate by the Board of Law Examiners; provided that, if the third day falls on a Saturday, Sunday or contractual holiday, then the notice will be deemed to have been given on the next business day that is not a Saturday, Sunday or contractual holiday.  If the law graduate is successful in passing the bar examination on a third attempt, upon admission to the bar they will have recall rights to the job from which they were terminated for one [1] year following the date of termination, subject to hiring needs and conditioned on satisfactory probationary evaluations during their initial tenure.  Staff Attorneys who are rehired after passing the bar examination following termination after two bar failures will be given service credit for each month actually worked as a law graduate prior to termination.

**§ 3.3.3.        *Senior Staff*.** A Senior Staff Attorney may be disciplined or terminated only for "just cause," with recourse to the grievance and arbitration procedures provided in §1.8.

## § 3.4.        *LEAVE*

**§ 3.4.1.        *Illness or Disability*.** The Society will continue full salary for up to ninety [90] days of employment for all attorneys on extended illness or disability.  Thereafter, such attorneys will receive sixty [60] percent of salary up to a maximum of $3,000 per month, or, for attorneys who become disabled on or after January 1, 2001, $4,000 per month, or, for attorneys who

become disabled on or after January 1, 2014, $8,000 per month, subject to the terms of the then-current insurance policy, which is incorporated by reference herein and which may be changed only if equivalent coverage and terms are provided. In accordance with the disability insurance policy, any Social Security benefit payable when disability occurs will be deducted from the insurance benefit, but the amount of deduction will not be increased because of a subsequent rise in Social Security benefits. In order to ensure that long-term disability benefits are paid on a tax-free basis, Staff Attorneys will have the individual option of paying any extra premium for such coverage, provided that this arrangement is cost-neutral to the Society. Effective September 1, 2019, the 2-year cap on mental health Long Term Disability benefits was removed. The Society will not terminate or modify the disability insurance policy during this Agreement without the Union's consent.

§ 3.4.2. *__Holidays__*. Staff Attorneys will receive the paid holidays of New Year's Day; Martin Luther King Jr., Day; Lincoln's Birthday; Presidents' Day, Memorial Day; Juneteenth Day; Independence Day; Labor Day; Indigenous Peoples' Day; Veteran's Day; Election Day; Thanksgiving Day; Day After Thanksgiving; Christmas Day, and on such additional days as set forth by the Society.

The following holidays are designated as a floating holiday: Lincoln's Birthday; President's Day; Election Day; Veteran's Day; Indigenous Peoples' Day; and the Day After Thanksgiving. If a Staff Attorney works a compensatory shift on a floating holiday other than the Day After Thanksgiving, they may cash it out at 1.5 holiday pay rate if cashed out, or earn 1.5 times hours of the shift in compensatory time; they do not earn a floating holiday. If the Staff Attorney does not work a compensatory shift and works on a floating holiday, they will earn a floating holiday.

The Criminal Defense Practice will receive time and a half for institutional assignments on major holidays, either 1.5 times pay if cashed out or 1.5 times hours of the shift in compensatory time. Major Holidays do not include floating holidays or the day after Thanksgiving.

The Friday after Thanksgiving is an extended vacation day. Since courts are open, limited staff will be required on site to provide skeleton coverage for the office. Staff who are scheduled to come to work that day, as well as staff who are not scheduled to come in but who choose to do so will be credited a day which must be taken no later than the following September 30. Because the courts are open on the Friday after Thanksgiving, the Society must remain open and must staff all arraignment, intake, and institutional assignments. If staff choose not to work the day after Thanksgiving, they must not have an institutional assignment and must arrange for any case coverage.

§ 3.4.3. *__Bereavement__*. Upon death of a family member, Staff Attorneys are entitled to paid bereavement leave of five [5] work days and seven [7] work days for employees whose bereavement requires travel outside the continental USA. Family member is defined as an individual with any of the following relationships to the Staff Attorney's and/or their qualifying domestic partner: (1) spouse, and parents thereof; (2) children, and spouses thereof; (3) parents, and spouses thereof; (4) siblings, and spouses thereof; (5) grandparents and grandchildren, and spouses thereof; (6) domestic partner and parents thereof, including domestic partners of any individual in 2 through

5 of this definition; and (7) any individual related by blood or affinity whose close association with the employee is the equivalent of a family relationship. Parents include biological, adoptive, step, foster parents, or a person who stood in loco parentis to the employee. Child includes biological, adopted, step, or foster child. Domestic partner is an adult in a committed relationship with another adult. All other bereavement leave will be charged against annual leave.

However, each employee shall also receive an additional ten [10] days of discretionary bereavement leave for the purposes associated with the death of an individual not among the immediate family members listed, or for additional paid time off in association with the death of a listed family member. These days are to be used exclusively for bereavement purposes and are accrued as follows: five [5] days at the completion of the first year of employment; five [5] additional days upon completion of the fifth year of employment. Employees may use up to the amount of discretionary leave accrued at the time of the bereavement. Every ten years of a Staff Attorney's tenure, all exhausted discretionary bereavement leave will be replenished so that the Staff Attorney begins again with a maximum total of ten [10] days of discretionary bereavement leave at each ten [10] year interval of tenure.

§ 3.4.4.    *Leaves of Absence*. The Society will provide the leaves of absence described below. Upon written request and payment of the premium by a Staff Attorney, the Society will continue their insurance coverage during such leave. To the extent practicable, subject to staffing, space, workload, length of leave and other demands, LAS will attempt to return the Staff Attorney to the same borough or office/location that they were assigned to before their leave. More specific requests for placement on return from leave will be considered on a case by case basis.

§ 3.4.4.1.    *Sabbatical*. After each three [3] years of service, Staff Attorneys may request an unpaid sabbatical leave of absence for up to one [1] year. Sabbatical leaves may only commence on January 1, April 1, July 1, or October 1. A request for a sabbatical leave must be made at least 120 days prior to the proposed commencement date.

§ 3.4.4.1.1. *Private Practice*. Staff Attorneys on sabbatical leave may engage in the practice of law when it does not present a legal or funding conflict with the Society, subject to case-specific prior Management approval.

§ 3.4.4.1.2. *Return*. Upon their return from sabbatical leave, a Staff Attorney will be paid at the then-current salary level at which they were last employed prior to their leave, unless the Society, in consultation with the Union in regard to criteria and principles, determines that the Staff Attorney's work experience while on leave justifies a higher level. Absent a showing of reasonable necessity by the Society, an attorney will have the right to return to the practice from which they departed.

§ 3.4.4.2.    *Child Care*. A Staff Attorney may take an unpaid leave of absence for up to ten [10] months for the sole purpose of caring for an adopted or a newborn natural child of the Staff Attorney, or of their same- or opposite-sex domestic partner. When possible, requests for such leave will be submitted at least three [3] months in advance of the approximate starting date of such leave. A pregnant Staff Attorney may elect to use part of such leave prior and contiguous to their pregnancy disability leave.

**§ 3.4.4.3.**    *Parental Leave*. Subject to approval as to its legality, any parent of a newborn or newly-adopted child/children or a new step parent of a child/children who resides with the Staff Attorney-parent more than fifty [50] percent of the time, may take up to fourteen [14] weeks (70 days, exclusive of paid holidays) of paid parental leave in order to care for and establish a relationship with the child/children. In concept, this leave is provided to assure paid time off during the period immediately following the birth, adoption, etc.  Paid parental leave would therefore precede any vacation, comp. time or unpaid leave that the new parent/step-parent may wish to take in connection with the birth, or adoption, etc., and would run concurrently with the birthing parent's disability leave after the triggering event, exclusive of paid holidays. Paid parental leave would run concurrently with any New York State Paid Family Leave (PFL). Paid parental leave would be available for all Staff Attorneys, regardless of years of service.

However, recognizing that individual circumstances may vary, the employee(s) may, in consultation with supervisor(s) involved, use the paid parental leave on a different schedule, provided that (1) it cannot extend beyond the first year after the triggering event; and (2) the total amount of paid time off associated with the commencement of the particular parenting relationship is not increased by the rescheduling. This section fully applies to all the enumerated categories of children of an attorney's domestic partner.  For the purposes of adoption, the child must be under 21 at the start of the adoption process.

**§ 3.4.4.4.**    *Other Leave*. The Society may, in consultation with the Union in regard to criteria and principles, extend or grant leaves for purposes other than those set forth above.

**§ 3.5.**        *FREE SPEECH*. The expression of personal religious, political, social or economic beliefs of each and every attorney is fully guaranteed and will never constitute grounds for discharge or relief from an individual assignment unless, in either instance, it can be demonstrated that such expression has, or will, directly interfere(d) with, and detract from, representation of a Society client so as to render said representation less than at the highest level of competence and effectiveness.

**§ 3.6.**        *INTERPERSONAL CONFLICT*. Where personality differences between an attorney and their supervisor threaten to adversely affect effective operation of an office and/or continued employment of the attorney, the local Attorney-in-Charge will, wherever feasible, transfer personnel to a work unit in the same office or, if necessary, a different office.

**§ 3.7.**        *PART-TIME WORK SCHEDULES*. The Society will provide a flexible work environment, consistent with the Society's primary obligation to its clients.

**§ 3.7.1.**    *Definition and Workload*. A part-time schedule shall be any schedule of less than one hundred [100] percent of an ordinary schedule. A part-time attorney's workload will be adjusted in proportion to their schedule.

**§ 3.7.2.**    *Positions*. All Staff Attorneys may apply for a part-time schedule. Assuming the necessary demand, there will be a minimum of ten [10] positions in the Criminal Appeals Bureau, twenty [20] positions in the Criminal Defense Practice (CDP), nine [9] positions

in the Civil Practice, and ten [10] positions in the Juvenile Rights Practice (JRP). Many part-time positions in CDP and JRP must be worked in job share teams in order to be feasible from a workflow standpoint. A Staff Attorney who is working part-time as a transitional (less than ninety [90] days) accommodation for a disability shall not be counted towards these minimum numbers, although part-time schedules in accommodation of a disability that is expected to last in excess of ninety [90] days would be considered to be part of the practice's minimum allocation. The Society shall make reasonable efforts, subject to staffing considerations, to grant requests for part-time schedules above the minimum levels.

§ 3.7.3.    ***Scheduling and Selection***. A request for a part-time schedule shall be submitted, to the extent possible, at least ninety [90] days in advance of the intended start date of the schedule. If the minimum number of positions for that attorney's practice are not filled, the request will be granted and the starting date will be arranged to match the request as closely as possible. If the minimum number of positions for that attorney's practice are filled, the Society may delay or deny commencement of a part-time schedule due to workload and staffing considerations. Any necessary delay or denial of a part-time schedule will be accompanied by a written statement of the workload and staffing considerations that are at issue, and the manager's best estimate of when they can be overcome. Wherever there is a surplus of outstanding applications, a first preference shall be given to those applicants who will use their non-work time to be an "at-home" parent with childcare responsibility during those hours; a second preference shall be given based on seniority.

§ 3.7.4.    ***Hours and Compensation***. Staff Attorneys who job share will have the individual option to work more than 50% paid time, subject to prior Management approval. The Society shall not incur costs that are disproportionate to the Staff Attorney's reduced schedule. Part-time employees whose schedules fall within the eligibility requirements for our various lines of insurance (currently 17.5 hours per week for health coverages, long term disability and life insurance) will continue to have access to coverage, but will be required to pay a percentage of the premium that is equal to their percentage of non-work time, except that Staff Attorneys on part-time schedules as of the execution of the 2016 CBA whose benefits payments had been set under the former contract did not have their then current payment increased by operation of this agreement so long as they remained continuously in part-time status. While the Society will provide office space to part-time employees in accordance with current standards to the extent such space is available, increased use of part-time employees may call for reasonable accommodations in the use of space in order to avoid incurring costs that are disproportionate to part-time attorneys' schedules. Effective September 1, 2001, part-time employees will advance annually on the salary schedule.

§ 3.7.5.    ***Availability and Coverage***. During the non-work part of the work week, part-time attorneys will be available for emergencies, court appearances, conferences, or necessary telephone consultations. If a CDP part-time attorney works a night or weekend arraignment shift in addition to their regular hours, they will earn a comp day which may accrue and which may be cashed in; if, due to trial or other necessary commitments, a part-time trial attorney must work more days in the week than the attorney is scheduled to work, the attorney, in consultation with their supervisor, will make adjustments in their future work schedule to restore the balance and/or will have their pay adjusted for the relevant pay period(s) to reflect the work.

§ **3.7.6.**    ***Other Employment***. Other gainful employment or professional activities, except for bar association or Union activities, are prohibited during non-work hours.

§ **3.7.7.**    ***Return***. A qualifying attorney who holds one of the minimum number of part-time positions cannot be returned to full-time staff against their will. Except in JRP, an attorney who received one of the minimum number of part-time positions shall have the right to return to a full-time schedule on thirty [30] days notice. All part-time attorneys in JRP, and attorneys holding part-time positions in other practices above the allocated minimum number may return, subject to budgetary considerations, and in no event later than the starting date of the next available full-time vacancy following the notice. If there are more applications to return to full-time status from attorneys in part-time positions above the allocated minimum number than there are available full-time positions, preference for return will be based on seniority, except that all CAB attorneys on part-time schedules as of the ratification date of the 2016 CBA shall have the right to return to a full-time schedule, even if their number is in excess of the practice's allocated minimum.

§ **3.8.**    ***TELECOMMUTING***. Staff Attorneys will, in consultation with their supervisors, be permitted to telecommute to the extent consistent with the nature of their work and other staffing/work needs of the office. Management is committed to expanding the remote access properties of the network to support telecommuting needs. See also, Appendix E for side letter dated December 20, 2023.

§ **3.9.**    ***TRANSFERS AND PROMOTIONS***

§ **3.9.1.**    ***Voluntary***.  The Society will promptly post and notify the Union of all expected Staff Attorney and supervisory vacancies. The Society shall give due consideration to 1) an attorney's request to work in a particular county because it is their county of residence or more convenient to their county of residence; 2) a senior Staff Attorney's request for a change of workplace or practice and for the appointment to new staff positions created by the Society. Every attorney who has completed their original commitment and who desires a transfer to another practice will be interviewed. Transfer requests and applications for promotion will be granted to Staff Attorneys whose qualifications are equal to those of outside candidates, subject to staffing needs and affirmative action considerations.

§ **3.9.2.**    ***Involuntary***. Whenever possible, an attorney who is permanently transferred from one [1] office to another will receive three [3] weeks written notice of such transfer and, upon request, a written statement of the reasons therefore.  Due consideration will be given to the request of permanently  transferred attorneys to complete specific cases in which the level of preparation  is such that their removal may be detrimental  to the client.

§ **3.10.**    ***EXPENSES***

§ **3.10.1.**    ***Transportation***.  Staff Attorneys in all practices leaving evening and/or night institutional assignments will be fully reimbursed for taxi fare within the five NYC boroughs. Managers will approve taxi fare beyond NYC limits on a case-by-case basis.  The Society will issue expense reimbursement checks within five [5] weeks from submission of expenses forms, if forms

are submitted monthly.

§ **3.10.2.**    ***Additional Transportation Procedures - Civil Practice***. Staff Attorneys in the Civil Practice will be reimbursed for the cost of car service or cab fare to travel home during the evening from community outreach and other assignments away from the office as specified in Section 3.10.1. For community outreach and home visits to homebound clients conducted during other times of the day, staff members with safety concerns about travel to and from outreach sessions should discuss with their supervisors the most appropriate means of transportation, including car service or cab fare from a central subway location to the outreach assignment. Staff Attorneys will be reimbursed for transportation methods approved by office supervisors under such circumstances. In an instance where an office supervisor determines not to approve car service or cab fare for daytime outreach, the supervisor will review that determination with the local Attorney-in-Charge before a final decision is made as to the means of transportation in such cases.

§ **3.10.3.**    ***Additional Transportation Procedures - Criminal Practice and Juvenile Rights Practice***. Staff Attorneys will be reimbursed for travel relating to arraignments as follows: For Night Court: A Staff Attorney who works a night court arraignment shift will be reimbursed for parking and round-trip mileage if they choose to drive to and from work. Staff Attorneys are expected to produce receipts for their parking expenses so that the Society can comply with audit requirements. For the first such reimbursement request seeking reimbursement for roundtrip travel from and to home under these circumstances, the Staff Attorney will generate an electronic summary of mileage (through an application such as Google Maps, Apple Maps, etc.) confirming the mileage which the Society will keep on file for future reimbursement requests. Please note that turn-by-turn directions themselves are not required.

If the Staff Attorney elects to travel to and from such a night shift by means other than their own vehicle, the Staff Attorney will be reimbursed for cab fare home from night court as specified in Section 3.10.1. For traditional taxis, the driver can provide the Staff Attorney with an electronic receipt to document such travel expenses. For car services other than traditional cabs, the Staff Attorney is expected to obtain a receipt from the driver so that the Society can comply with audit requirements. If a receipt is not available, the Staff Attorney should submit the missing receipt attestation form to receive reimbursement. The Society reserves the right to require Staff Attorneys to use specific car service companies which provide receipts and/or accept credit cards.

For Weekend Day Arraignments and Holiday Day Arraignments, the Society will reimburse roundtrip mileage and parking for a Staff Attorney when public transportation available to them is unreliable or the Staff Attorney is traveling from a remote location, including locations outside of the five boroughs of New York City.

§ **3.10.4.**    ***Meals***. Staff Attorneys in all practices will receive meal allowance of up to the per diem rates established by the U.S. General Services Administration for New York City for performing mandatory work assignments that extend five [5] or more hours beyond the scheduled workday. Receipts are required for all expenses incurred. If a receipt is not available, a Staff attorney should submit the missing receipt attestation form to receive reimbursement.

**§ 3.10.5.    _Foreign Language Classes_.**  The Society will maintain a $25,000 fund to reimburse individual Staff Attorneys a maximum of $500 annually for the cost of foreign language classes relevant to Legal Aid work.

**§ 3.10.6.    _Staten Island_.**  In light of the unique circumstances that exist for Staten Island staff, the Society agrees to continue to pay for parking costs for Staten Island CDP, JRP, and CIV attorneys.  The benefit will only apply to Staten Island staff and will not be expanded to staff in any other borough.

**§ 3.10.7.    _Office of Court Administration Secure Pass_.**  The Legal Aid Society will reimburse Staff Attorneys for the cost of an Office of Court Administration (OCA) Attorney Secure Pass (the 5 year attorney pass that is available for online renewal and is currently $50).

**§ 3.11.    _PERSONNEL RECORDS_**

**§ 3.11.1.    _Review and Response_.**  Attorneys have the right to: 1) review their individual permanent personnel records; 2) receive a copy of any formal or informal document concerning their performance or character contained therein; and 3) have placed therein their statement concerning any such document. A Staff Attorney will sign a receipt for every document provided under this provision, which will be attached to each such document in the file.

**§ 3.11.2.    _Disclosure to Third Party_.**  During an attorney's current and immediate past employment, the Society will not disclose from such files to third parties, except with express or implied consent of the attorney, or under legal process.  An attorney who lists the Society as a current or past employer impliedly consents to the Society's disclosure of information to the person or organization to whom the fact of Society employment has been provided.

**§ 3.12.    _PRO BONO REPRESENTATION_.**  Staff Attorneys wishing to engage in _pro bono_ legal services on their free time will inform the Chief Attorney, who will approve activity that does not present a conflict of interest or otherwise make the attorney's services unavailable to the Society and its clients.

**§ 3.13.    _SENIOR STAFF RETENTION_.**  There will be a joint Union-Management committee to study the financial and other issues of retaining senior Staff Attorneys above step 13.  This committee shall provide findings to both ALAA and Management at least once per calendar year.

**§ 3.14.    _JOB SECURITY_.**

**§ 3.14.1.    _Plan_.**  If economic retrenchment becomes necessary, the Society will work closely with the Union to ensure job security of every attorney then on staff.  Where retrenchment appears necessary, Union and Management will meet at least seventy-five [75] days in advance of the implementation date, or as soon thereafter as possible, to develop a plan.  In the course of such discussion, the Society will provide the Union with all information appropriate to an informed decision.  The Society will provide sixty [60] days' notice of the transfer or layoff of specific attorneys, or such lesser notice as is available to the Society.

§ **3.14.2.** *Transfer*. Where vacant Staff Attorney positions exist outside the affected practice, Staff Attorneys subject to layoff have the right to transfer to such vacant positions, under the terms below.

§ **3.14.2.1.** *Scope*. The right to transfer is to offices where like skills are required, e.g., trial to trial, appeal to appeal. The Society, in consultation with the Union in regard to criteria and principles, will match attorneys and vacancies.

§ **3.14.2.2.** *Definition of Vacancy*. During economic retrenchment, the Society must make available to Staff Attorneys threatened with layoff all vacancies in all practices that are, or will become, available within a reasonable time because of known resignations, normal attrition patterns, or discharges for cause. Such positions will be made available no later than the time that the position would normally be filled. Acceptance of a job offer by an outside applicant will not constitute filling of the position if the applicant has not yet commenced employment.

§ **3.14.2.3.** *Implementation*. Where there are sufficient vacancies in the Society to place all of those subject to layoff, volunteers will be transferred first. Thereafter, transfers will be offered, on the basis of reverse seniority, to yearly groups that consist of all those whose anniversary dates, calculated in terms of continuous and unbroken bargaining unit membership, fall within the twelve [12] months from July 1 through June 30; all attorneys within a yearly group are considered to have the same anniversary date for these purposes. Attorneys in the subsequent yearly group will be transferred only when the previous group has been exhausted. If transfers must be made by choosing from among those within the same yearly group, the Society will determine the order of transfer based on merit, including affirmative action considerations. Where there are insufficient vacancies to accommodate all affected employees, transfers will be offered to yearly groups, as defined above, in seniority order.

§ **3.14.2.4.** *Status*. Each transferred Staff Attorney will be deemed a new hire for probationary purposes, based on the date of transfer.

§ **3.14.2.5.** *Refusal*. Staff Attorneys who refuse transfer will be deemed terminated because of economic retrenchment in their practice.

§ **3.14.3.** *Layoff*. If the number of vacancies in other practices is insufficient, layoff will be imposed first on the least senior yearly group, as defined above. The Society will continue to provide medical benefits, in the form and amount existing on the date of such termination, for ninety [90] days from the termination date, at the conclusion of which laid off attorneys may exercise applicable COBRA rights.

§ **3.14.4.** *Recall*. Staff Attorneys transferred or terminated under this provision have recall rights to the jobs from which they were transferred or terminated for eight [8] months from the date of transfer or termination, or until the following July 1, whichever is later. Recall will be issued in the following order, to those who were: 1) actually laid off without having been offered a transfer; 2) transferred; and 3) laid off after having rejected transfer.

§ **3.14.4.1.** ***2004 Layoffs***.  ALAA acknowledges that in June 2004 the Society has granted the grievances filed on behalf of Staff Attorneys in the Criminal Appeals Bureau and the Prisoners' Rights Bureau insofar as they objected to layoffs of Staff Attorneys in the Criminal Appeals Bureau and Prisoners' Rights Project on the ground that the Criminal Defense Practice, the Criminal Appeals Bureau, and the Prisoners' Rights Project are part of one area of criminal practice within the Society. In accordance with  this grievance, the Society shall consider criminal defense, criminal appeals, and prisoners' rights Staff Attorneys as Staff Attorneys in the same Criminal Practice area, without regard to separate divisional distinctions. The Society shall also consider civil and volunteer Staff Attorneys as Staff Attorneys in the same Civil Practice area, without regard to separate divisional distinctions.  Subsequent to the July 16, 2004 Memorandum of Understanding, the Prisoners' Rights Project was moved from the Criminal Defense Practice to the Civil Practice.

§ **3.15.**　　　**_RESIGNATION_**.  Staff Attorneys will give at least thirty [30] days' notice of intent to resign, exclusive of vacation used during that period.

§ **3.16.**　　　**_VOLUNTARY RETIREMENT INCENTIVE PROGRAM_**.

§ **3.16.1.**　　For each year of the CBA, with the exception of Fiscal Year 2023, the Society will offer a Voluntary Retirement Incentive (VRI) for up to fifteen [15] staff attorneys who are on active payroll status and: a) who are sixty [60] years or older at their retirement date; and b) have at least twenty-five [25] years of services at their retirement date. Each Staff Attorney who is approved for and accepts the VRI by timely signing a Voluntary Retirement Agreement and Release will receive a one-time payment of $62,500. VRI recipients sixty-five [65] years of age or older at the date of retirement will be eligible for retiree medical benefits upon retirement. VRI recipients between sixty [60] and sixty-four [64] years of age with twenty-five [25] years of service may receive the $62,500 retirement incentive, but they and their spouse and dependents will not be eligible for retiree health benefits or any other benefits paid by the Society.

§ **3.16.2.**　　**_Voluntary Retirement Incentive Program Timeline_**. Notification of the Voluntary Retirement Incentive (VRI) Program will be sent to all eligible staff attorneys by October 1st. Applications for the VRI Program will be accepted until November 1st. All applicants will be notified of their acceptance or rejection by November 30th. If there are any changes to the aforementioned schedule, the Society will notify the Union of any anticipated changes by September 1st in a given fiscal year.

§ **3.16.3.**　　**_Voluntary Retirement Incentive Program Procedures_**. The Staff Attorney's retirement date will be mutually agreed upon between the Staff Attorney, Borough Attorney-in-Charge/Office Head, and Chief Attorney of the Practice, provided that the retirement date will be on or before March 31st. Exceptions for retirement dates beyond March 31st may be granted in extraordinary circumstances, but in no cases may a retirement date be later than June 30th. If more than fifteen [15] eligible Staff Attorneys apply for this benefit, priority for receiving the VRI will be determined based on years of service.

**§ 3.16.4.    _Voluntary Retirement Incentive Program Payment_.** Payment of the $62,500 VRI benefit will be made within sixty [60] days of an approved applicant's separation date.

## § 3.17.    _HEALTH AND SAFETY_

**§ 3.17.1.    _Generally_.** The Society will provide employees with a work environment that is safe and conducive to good health.  It also has the goal of providing offices that are clean, in good repair and secure, and will continue efforts to improve the condition of offices in which its employees work. The Society will promptly clear the work place if, due to any circumstance, it is or becomes unhealthy or unsafe, and will rectify the problem prior to reoccupation.  The Society will use all reasonable means to ensure that conditions at all off-site locations (e.g., courts, jails, etc.) are non-harmful, noninjurious, and that they comply with all applicable codes and regulations.

**§ 3.17.2.    _Specific Measures_**

**§ 3.17.2.1. _New Technology_.** The Society will provide the Union with advance written notice of introduction into the workplace of new technology which may affect Staff Attorney health or safety.  Where feasible, such notice will be given before the Society makes a binding commitment to purchase specific equipment.

**§ 3.17.2.2. _Security_.** The Society will offer lockers or locking furniture to each Staff Attorney.

**§ 3.17.2.3. _Infectious Disease_.** The Society will take all reasonable steps to protect staff from unnecessary health risks and will pursue affirmative measures to assure that the Society's clients are not compelled to endure unnecessary health risks from infectious disease by virtue of their incarceration or poverty.  These steps will include:  1) twice annual PPD tuberculosis tests and any indicated follow-up procedures, at no cost to Staff Attorneys, administered by appropriate medical personnel, along with sufficient work time for necessary visits to a medical office; 2) payment of all unreimbursed out-of-pocket medical expenses related to diagnosis and treatment of TB; 3) medically-appropriate masks on request, accompanied by training and certification in their safe and appropriate use; 4) training in minimizing TB exposure; 5) "safe rooms" in which to conduct interviews with clients suspected of having TB; 6) litigation as appropriate to improve non-Society facilities and to make TB testing and care available to the Society's clients; 7) prompt response to requests for exemption from normal work requirements, including arraignments and homeless shelters, because of compromised immune systems or pregnancy, on a person-specific, symptom-specific, site-specific, and task-specific basis; and 8) appropriate inoculation of Staff Attorneys, at the Society's expense, against such contagious diseases as measles and hepatitis.

**§ 3.17.3.    _Joint Union-Management Health and Safety Committee_.** The parties will establish a joint Union-Management committee to address workplace health, safety and physical working conditions, including, but not limited to heating, cooling, elevator service and security.

**§ 3.17.3.1.** ***Duties***. Among its duties, the Committee will consider and make recommendations concerning: 1) problems or potential problems at any job site; 2) anticipatory maintenance (e.g., replacing systems which have exceeded expected years of use, or are nearing such time); 3) space procurement and lease renewal; and 4) other areas of health, safety and physical working conditions.

**§ 3.17.3.2.** ***Procedure***. All non-emergency health and safety matters will be submitted to the Committee for investigation and resolution prior to filing of any grievance with regard to that subject. If not resolved and/or grieved within 30 days, the Union may immediately proceed to expedited AAA arbitration.

**§ 3.17.4.** ***Office Space***. The Society will provide approximately one hundred and fifty [150] square feet of office space per Staff Attorney, including support staff, of a caliber equal or superior to space presently provided in the Manhattan or Brooklyn Criminal Defense facilities, subject to availability of suitable space inside court buildings or other leased space. Where compliance with any arbitration decision results in a staffing reduction, there will be a proportional reduction in office workload.

**§ 3.18.** ***RECORD KEEPING***. ALAA acknowledges that LAS is implementing a time records system for Staff Attorneys for the purpose of assisting LAS in its efforts to maintain and obtain funding to support the work of LAS.

**§ 3.19.** ***PROTECTIONS FOR IMMIGRANT STAFF***. In recognition of LAS' commitment to equal justice for all, LAS will establish policies to address concerns of our immigrant and non-citizen staff members.

# Article 4/Quality of Representation

**§ 4.1.**    ***STANDARD OF ADVOCACY***.  The Society and its individual attorneys are deeply committed to the highest standards of professional competence and to vigorous representation in each and every case.

**§ 4.2.**    ***CONTINUITY OF REPRESENTATION***

**§ 4.2.1.**    ***Generally***. Continuity of representation is an important factor in realizing the most effective representation of clients, in that it:  1) enhances the attorney-client relationship; 2) provides the best opportunity for an attorney to initiate early case preparation; and 3) strengthens development of an integrated theory of representation.

**§ 4.2.2.**    ***Criminal Defense Practice***

**§ 4.2.2.1.**    ***Scope***.  The Society will maintain vertical continuity of representation from Criminal Court arraignment through filing of a notice of appeal and pursuit of a stay of execution after Supreme Court conviction. The Society's form notice of appeal will state that the Society represented the client in the trial court and, where consistent with the client's wishes, will request that representation by the Society continue on appeal.

**§ 4.2.2.2.**    ***Implementation***.    Continuity in the Criminal Defense Practice is neither monolithic nor inflexible, but rather adaptive to:

**§ 4.2.2.2.1.** ***Location***. The various trial courts of our practice and other institutional and professional obligations;

**§ 4.2.2.2.2.** ***Responsibilities***. Responsibilities of Supervisors, Staff Attorneys and special unit attorneys consistent with § 4.6.1 and with the goals of effective representation and service of the client's best interest;

**§ 4.2.2.2.3.** ***Training***. Opportunities for Staff Attorneys to develop skills and gain experience through case or proceeding reassignments which enable less experienced Staff Attorneys to handle matters consistent with their skills and experience (misdemeanor trials and felony preliminary hearings).  Cases will be reassigned for training purposes after consultation between Staff Attorneys and Supervisors, and except in unusual circumstances will not be transferred when an attorney wishes to retain a particular case;

**§ 4.2.2.2.4.** _**Workload**_. Reallocation of workload to assure timely preparation and effective representation, including:

**(1)** _**Experience**_. Assignments consistent with an individual attorney's level of experience and workload, such as case transfer from non-certified to felony-certified attorneys, or from certified to special unit attorneys;

**(2)** _**Arraignment Balance**_. Availability of Staff Attorneys with requisite experience to accept all assignments at intake without undue delay;

**(3)** _**Withdrawal and Reassignment**_. Where there is a workload problem, the affected attorney will first be withdrawn from further intake. Should additional relief be necessary, cases will be reassigned to Staff Attorneys with the workload capacity and experience necessary to afford timely, effective representation. Neither of these steps will occur without consultation between the supervisor and the attorney. Nothing in this Article will operate to modify the grievance procedures contained in § 4.3;

**(4)** _**Consolidation**_. Multiple cases with the same client pending in one [1] borough, handled by more than one [1] Staff Attorney; or

**(5)** _**Unavailability**_. Extended sickness, disability, or termination of employment.

**§ 4.2.2.3.** _**Review and Adjustment**_. The Society's legal representation will be reviewed and adjusted as necessary to maintain continuity in the event of changes in court structure.

**§ 4.2.3.** _**Other Practices**_. Practices other than the Criminal Defense Practice shall maintain continuity of representation. Any modification of continuity must first be negotiated with the Union.

## § 4.3. _WORKLOAD_

### § 4.3.1. _General_

**§ 4.3.1.1.** _**Standards**_. Within six [6] months of this agreement, standing joint Union-Management workload committees in each practice will set provisional guidelines, subject to ongoing revision and refinement, for maximum individual attorney workload consistent with high-quality representation for each LAS client. Where that guideline is exceeded, the attorney will be relieved through such steps as reduced intake, case transfer, and/or other appropriate measures. Acknowledging that this committee was not established in the last contract, the Union and the Society will establish this committee during the term of this agreement.

**§ 4.3.1.2.** _**Negotiations of Society Contracts**_. The Society will, in consultation with the Union, use its best efforts to negotiate for all practices contracts that provide sufficient resources to handle the workload contemplated, and that further provide for necessary adjustments

of resources and/or workload over the term of the contract. Whenever feasible, Management will solicit the Union's views regarding submission of narrative reports for funders or other oversight bodies concerning Legal Aid performance under its contracts.

§ **4.3.1.3.** _**Monitoring**_. The Union will participate with Management in regular monitoring of workload in all practices, including, but not limited to, monthly counts of Staff Attorneys, caseload, institutional assignments and filings per office. In some practices, current technology lacks the necessary capacity to fully maintain this information; the Society will make its best effort to manually maintain the information and to update the technology as soon as practicable. The Society will provide the reports of said monitoring to a union representative on a monthly basis, or provide access to this information at any time on Law Manager, or other technology used for this purpose.

§ **4.3.1.4.** _**Consultants**_. The Union will participate in decisions as to whether outside consultant expertise is appropriate to assist in workload and other analysis related to client representation, and in the selection of such consultants when they are to be retained.

§ **4.3.2.** _**Grievances**_

§ **4.3.2.1.** _**Standard**_. The standard against which workload grievances are evaluated is whether further cases can be accepted consistent with professional responsibility. The following are among the relevant factors to be used in applying that standard to a given situation: 1) court structure; 2) character of cases assigned to the grievant (individual or office); 3) efficiency, productivity and diligence of the grievant (individual or office) in handling those cases; 4) Code of Professional Responsibility; 5) ABA standards; 6) NLADA standards; and 7) level of services currently provided by other quality indigent defense providers in major urban jurisdictions

§ **4.3.2.2.** _**Procedure**_.

**(1)** _**Individual Grievance**_. Informal discussion with the grievant's supervisor or local Attorney-in-Charge or their designee will be held within twenty-four [24] hours of the request for a meeting, excluding weekends and holidays. Immediately thereafter, the grievant may file a written appeal with the local Attorney-in-Charge, Practice Chief Attorney and the Attorney-in-Chief (or their designees), in that order, each of whom will have no more than two [2] work days to respond in writing.

**(2)** _**Office Grievance**_. The Union may initiate an office-wide workload grievance on the basis that two-thirds [2/3] of the Staff Attorneys in the office believes the standard, as defined above at § 4.3.2.l., has been, or is about to be, met. The Practice Chief Attorney may attempt to rectify the problem through personnel adjustments, including new attorneys or support staff, temporary transfer of attorneys or support staff from other Society offices for a specifically limited duration, reallocation or reduction of work load, transfer of a limited number of cases to supervisors consistent with their own responsibilities, or any other measure consistent with this Agreement which may alleviate the condition. Except as a last resort, the Society will not permanently transfer attorneys from other offices, and only then if warranted by long-range demands

in each office. If no plan is presented, or if two-thirds [2/3] of the affected Staff Attorneys does not vote to accept the plan, the matter will be submitted to a panel, as hereafter described within ten [10] working days (which period may be extended by mutual agreement between the Chief Attorney and the Union). The plan need not be implemented within the ten- day period, but will, at a minimum, specify the dates by which its various aspects will be implemented.

*(3)*    ***Arbitration***. If the grievance is not disposed of through the above process, the Union may, within two [2] work days after the Attorney-in-Chief has rendered their decision, file a written demand for arbitration with the Attorney-in-Chief on behalf of the grievant. An arbitration will be convened within five [5] working days of receipt by the Attorney-in-Chief of the demand for arbitration. The parties and the arbitrator will regard such proceeding as an urgent matter requiring expeditious disposition. The arbitrator will be selected from the appropriate panel of fifteen [15] names established and/or modified by the parties' mutual agreement, from which each party may strike three [3] names. If, after such elimination, the next prospective arbitrator panel member cannot adhere to the expeditious schedule set forth herein, the following panel member will be selected. The panel will hand down its decision as expeditiously as possible, but in any event within thirty [30] days after the close of hearings. Where a grievance is upheld, the office will stop accepting cases within fifteen [15] working days of the panel's action and will resume intake only within the framework of the panel's decision.

**§ 4.4.    *INTERVIEW CONDITIONS*.** Private attorney-client interviews are essential to delivery of effective representation. Whenever interview facilities in any court lack privacy, the parties will first seek to rectify such conditions by administrative action. If, within ninety [90] days after inception of administrative action, there is no objective indication of effective remedial action, the Society, in consultation with the Union, will take appropriate legal or other action to ensure availability of private interview facilities. The Society will also support necessary and proper actions taken by Staff Attorneys in the defense of their clients' right to confidential interviews.

**§ 4.5.    *OFFICE DAY*.** An attorney will not be called away from pressing non-courtroom professional activities in the office, unless their supervisor has no reasonable alternative thereto. In the Criminal Defense Practice, upon five [5] days notice by a Staff Attorney, supervisors will approve requests for an office day on which the Staff Attorney does not have conflicting assignments or cases scheduled. A supervisor will interrupt the office day for an unscheduled institutional assignment only after exhausting their best efforts to substitute other members of complex staff. Should the supervisor have no choice but to interrupt the office day, the Staff Attorney will be permitted to reschedule under the above criteria. In practices other than Criminal Defense, Management will make every effort to maintain a court coverage schedule which provides Staff Attorneys with at least one [1] office day each week free from such institutional assignments as intake and part coverage.

**§ 4.6.    *ATTORNEY-CLIENT-SUPERVISOR RELATIONSHIP***

**§ 4.6.1.    *Supervisory Responsibilities*.** Supervisors will provide effective, constructive oversight of staff and the work of their offices, including availability for consultation

with Staff Attorneys, consistent with their own caseload responsibilities.

**§ 4.6.2.**    ***Professional Differences***. Practice Chief Attorneys or their designees will be available for immediate consultation to resolve any professional differences between a Staff Attorney and supervisor in regard to handling a specific case. If these differences cannot be resolved consistent with applicable professional standards, the attorney will either follow the supervisor's decision or be relieved, after which the attorney may grieve the decision in question.

**§ 4.6.3.**    ***Evaluations***. A committee will be formed to explore staff participation in manager evaluations.

**§ 4.6.4.**    ***Case Coverage***. It will be Legal Aid Society policy for managers to arrange case coverage when staff attorneys are out on medical leave, on bereavement, or conducting or second-seating hearings and trials. These changes will be reflected in the Employee Handbook.

## § 4.7.    *TRAINING, EDUCATION, AND CERTIFICATION*

**§ 4.7.1.**    ***Committee***. There will be a joint Union-Management committee in each practice to develop and monitor training and education programs for Staff Attorneys.

**§ 4.7.1.1.**    ***Initial Training***. Each practice shall provide full initial training for new attorneys in the practice's basic practice areas. For the Juvenile Rights Practice, there shall be initial substantive training in all non-primary practice areas.

**§ 4.7.1.2.**    ***Annual Training***. Each practice will provide at least one comprehensive (8 hours or more) training/CLE per year, targeted toward experienced staff, addressing issues relevant to their practice.

**§ 4.7.1.3.**    ***Resources***

**§ 4.7.1.3.1.** ***Individual Materials***. The Society will exercise reasonable efforts to ensure reliable computer access for individual Staff Attorneys and provide individual Staff Attorneys with timely distribution of all appropriate legal resource materials, including the following.

**(1)**    ***Criminal and Juvenile Rights Practices***. Each attorney in the Criminal and Juvenile Rights Practices will receive a copy of the: 1) Penal Law (PL); 2) Criminal Procedure Law (CPL); 3) Vehicle and Traffic Law (VTL); and 4) up-to-date manuals containing forms used by police, defense, leading cases, statutes, etc., which will be expeditiously distributed.

**(2)**    ***Civil Practice***. Appropriate manuals and textbooks will be distributed to each Civil Practice Staff Attorney. The civil practice deskbook, federal rules, and federal and local court procedures will be provided to any Staff Attorney who requires them.

**§ 4.7.1.3.2.** ***Central Resources*** The Society will make available all necessary centralized legal resources, including: 1) office-level law libraries; 2) brief and motion

banks; 3) important new decisions; 4) one [1] set of New York Supplement reports for every ten [10] attorneys; 5) a non-Staff Attorney responsible for coordinating, maintaining and/or circulating the above materials; and 6) Staff Attorney library privileges at law schools and bar associations.

**§ 4.7.2.      *Orientation*.** The following orientation will be provided to newly employed attorneys, including, where appropriate, inter-practice transferees. Within the first seven [7] to ten [10] days of employment, each new attorney will participate in discussions led by supervising attorneys and/or experienced Staff Attorneys concerning the Society's goals and indigent representation, and observation and rotation through the courts. Initial on-the-job training will include observation of, and participation in, various parts of the Criminal and Family Courts, under guidance of supervisory and/or Senior Staff Attorneys. Civil Practice attorneys will be given an opportunity to observe Housing Court trials, commercial actions and administrative bearings. Civil Practice client interviews and initial work placement will take place in the third through tenth week.

**§ 4.7.3.      *Felony Certification***

**§ 4.7.3.1.**    The Society's goal is for Criminal Defense Practice Staff Attorneys to be limited felony certified by 12 months of active practice while employed by the Society (including the new hire training) and fully certified by 36 months of active practice while employed by the Society (including the new hire training).

**§ 4.7.3.2.**    Limited Felony Certification allows a Staff Attorney to handle all Class E felonies where the client is either a non-predicate or a nonviolent/violent predicate, Class D felonies where the client is either a non-predicate or nonviolent predicate, and Class B and C drug felonies where the client is a non-predicate or nonviolent predicate. Based on experience and effective representation in prior cases, a Criminal Defense Practice Staff Attorney may be granted permission in advance by their immediate supervisor(s) to represent a client above these levels.

**§ 4.7.3.3.**    Full Felony Certification allows a Staff Attorney to handle all felony cases which are handled by The Legal Aid Society, except homicide cases for which additional experience is required and with the recognition that, given the severity of A-I felonies, a supervisor will review with the Staff Attorney when it is appropriate to handle an A-I felony as lead counsel.

**§ 4.7.3.4.**    All internal transfers or lateral hires to the Criminal Defense Practice, including from other Practices or units within the Criminal Defense Practice, will have an individualized analysis at the start of their Criminal Defense Practice tenure utilizing the criteria in §§ 4.7.3.5. and 4.7.3.6. When applicable, based on the individual's prior experience, an internal transfer or lateral hire should reach limited and full certification in advance of the 12 and 36 month benchmarks. In all other cases, the below procedure will apply.

**§ 4.7.3.5.**    After 12 and 36 months of employment, each uncertified or limited certified Staff Attorney, respectively, will have a meeting with their immediate supervisor(s) with the right to have a union representative present. At this meeting, the Staff Attorney's hearing, trial and case resolution practice will be discussed and a decision will be made as to whether the Staff Attorney will be advanced in certification.

**§ 4.7.3.6.**    Although hearing, trial, motion and case resolution practices are

relevant to the certification decisions, the entirety of the Staff Attorney's work will be considered and discussed.

**§ 4.7.3.7.**    The Society will provide specific reasons as to why an individual Staff Attorney should not be advanced in certification. The Society will provide specific reasons as to why an individual Staff Attorney was not granted homicide certification where applicable.

**§ 4.7.3.8.**    When a Staff Attorney is certified, a written notice of such shall be provided to them within 30 days of such decision. A Staff Attorney who becomes certified remains so regardless of a subsequent transfer to a different complex/cluster or borough.

**§ 4.7.3.9.**    Should a Staff Attorney not be certified at the 12 and 36 month benchmarks, a written plan must be devised between the supervisor and the Staff Attorney to lead to certification. Should a Staff Attorney not be granted homicide certification, a meeting will take place between the Attorney-in-Charge of the Homicide Defense Task Force (HDTF), the Attorney-in-Charge of the Trial Office and Staff Attorney to discuss the reasons why the person was not granted homicide certification and to create a plan so that the attorney may reapply again in 6 months.

**§ 4.7.3.10.**    Follow-up meetings must occur every three months until the Staff Attorney is certified.

**§ 4.7.3.11.**    Nothing in this section prevents a Staff Attorney from being certified prior to the time periods contained herein. This section shall apply to all current Criminal Defense Practice Staff Attorneys as well as new hires and new transfers. A Staff Attorney shall have the option to dispense with the various written forms, plans, and notices contained in this section in which event all such proceedings shall only be conducted orally.

**§ 4.7.3.12.**    All Criminal Defense Practice Staff Attorneys shall be entitled to felony training within 12 months of hire or transfer to the Criminal Defense Practice.

**§ 4.7.4.**    *__Continuing Legal Education.__*

**§ 4.7.4.1.**    *__Internal__*. Notwithstanding the above provisions, the Criminal Practice training program, attended, where appropriate by attorneys from the Juvenile Rights Practice, will include:  1) two [2] attorneys devoted full-time to training and education; and 2) instruction in the Code of Professional Responsibility and in contempt proceedings.  Subject to budgetary considerations, the Civil Practice will hire a full-time trainer and develop a continuing education program that includes expert *pro bono* speakers.  The Society will designate staff to provide Society-wide information on an ongoing basis regarding the Society's Continuing Legal Education (CLE) programs that are available for all Staff Attorneys

**§ 4.7.4.2.**    *__External__*. Subject to court staffing and funding, Staff Attorneys will continue, at the Society's expense, to attend appropriate PLI or other approved professional courses in New York City that directly relate to the attorneys' work, subject to court staffing and budgetary considerations.  The Society will inform staff about, and seek to expand the availability of, tuition-free law school courses.

**§ 4.7.5.** *__Professional Development__*. The Society and the Union will establish a joint Union-Management Staff Attorney Professional Development Committee with the aim to create rotator and other professional development positions both society-wide and within each practice and borough.

Agreed-upon committees and topics:

- *Rotator Positions*. As outlined in § 4.7.5, the Professional Development Committee is to examine various topics related to workload and professional development. We propose including a training rotator for JRP and rotations between practices.

- *Anti-Oppression Training*. The above committee should seriously examine the necessity for ant- oppression training.

- *Middle Attorney training*. Ensuring appropriate training for attorneys at middle and senior steps must be examined by this committee and in consultation with the joint union-management Senior Retention Committee.

- *Case Caps*. The above committee will explore case caps for the Civil practice.

**§ 4.8.     __MALPRACTICE INSURANCE__**. The Society will defend and hold harmless Staff Attorneys sued for malpractice under the terms and conditions contained in the NLADA policy, to the extent of $1,000,000/$1,000,000. The Society, in its discretion, may either purchase such coverage from an insurance carrier or self-insure.

**§ 4.9.     __OUTSIDE COUNSEL__**. The Society and the Union will each provide matching amounts up to $5,000 per contract year for Staff Attorneys who require outside counsel in matters arising solely from their Society employment. The Union and the individual Staff Attorney will have complete discretion as to whether outside counsel is justified, and in selection of, and fees for, such counsel, but the Society will pay outside counsel only after its designated representative has, prior to retention of outside counsel, had the opportunity to fully discuss each of the above discretionary issues with the Union President or their designee. These benefits will not be funded, and all payments by the Society will be made directly to the outside retained counsel upon receipt of their statement reflecting the amounts charged to each party.

**§ 4.10.    __SPECIAL LITIGATION__**

**§ 4.10.1.    *__Special Litigation__***. Each practice will assign lawyers on a full-time basis to special litigation projects that address matters of substantial client interests that are unsusceptible to customary trial and appellate processes, such as challenges to complex legal decisions and to statutory provisions; initiation of prisoners' rights test cases; and implementation of post-conviction remedies.

**§ 4.10.2.    *__Rotator Position__***. Each practice will create at least one rotator position for their special litigation/law reform unit (if applicable) that will allow current staff attorneys to join the

unit for a period of two years.

**§ 4.11.**      ***SUPPORT SERVICES***. The Society will provide support staff of adequate number and quality.  The Society will complete the computerization of all offices by June 30, 2000.

**§ 4.12.**      ***LAW ENFORCEMENT ISSUES***

　　**§ 4.12.1.**  ***Police Conduct Committee***. There will be a Joint Union-Management Police Conduct Committee representative of all Society practices.

　　**§ 4.12.2.**  ***Programs and Materials***. The Society will provide the Joint Police Conduct Committee with the resources to develop and implement a Society-wide plan to seek out, maintain, update, and make available the following programs and materials in relation to the New York City Police Department and all other relevant law enforcement agencies (e.g., PAPD, FBI, DEA, BATF, etc.): l) computerized citywide records of individual police misconduct, abuse and brutality, accompanied by a mechanism through which such records can be routinely input and accessed; 2) manuals and other statements of police policy, including the NYPD *Patrol Guide, Administrative Guide, Detective Guide, OCCB Investigative Guide, Narcotics Division Manual of Procedures, Legal Bulletins, Special* and *Interim Orders* and all other such materials which exist for specialized units within the NYPD and other law enforcement agencies; 3) guides to all police forms, annotated by case type; 4) preprinted or computer-formatted subpoenas designed to procure appropriate police reports by case type; 5) complete reference sets of police reports and procedures, at least one [1] copy of which will be maintained in each relevant Society office; 6) checklists to ensure the earliest possible transmittal of police reports from trial to appellate offices; 7) rosters of current and former members of law enforcement agencies available to educate attorneys about police practices; 8) form motions and sample memoranda of law that discuss the legal basis for discovery of police reports and personnel records at the earliest possible stage; 9) incorporation of the above police practice issues into the Society's training programs; and 10) referral of individual clients to appropriate agencies.

　　**§ 4.12.3.**  ***Police Abuse Project***. The Joint Police Conduct Committee will examine the mission of, and available funding for, a dedicated Society-wide unit to address police misconduct, abuse and brutality through litigation (such as broad injunctive relief and damage claims) and other means. Funding will be subject to final approval by the Society's Board of Directors.

**§ 4.13.**      ***SOCIETY POLICY POSITIONS***.  The Society and the Union will confer and consult closely in regard to all areas that involve professional responsibilities and obligations of Staff Attorneys and on all questions of public interest about which the Society plans, or has been requested, to express an opinion.  The Society will notify and seek participation from the Union as early as possible regarding any potential changes envisioned by management that may impact on provision of client service delivery methods, and/ or the structure of a practice, office or program.

# Signature Page

Executed this 13th day of May 2024.


The Legal Aid Society                              Association of Legal Aid Attorneys,
                                                   UAW Local 2325 (AFL-CIO)


By: *Twyla Carter*                                 By: _____
_____
Twyla Carter                                       Lisa Ohta
Attorney-in-Chief & CEO                            President


                                                   By: _____
                                                   Jane Fox
                                                   Legal Aid Society Chapter Chair